# EXHIBIT A

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA.

CASE NO.:

SARA ALLENGER, as personal representative of
the Estate of MARK PRATT,

        Plaintiff,

vs.

LIVANOVA PLC, LIVANOVA DEUTSCHLAND
GMBH (f/k/a SORIN GROUP DEUTSCHLAND
GMBH), and LIVANOVA HOLDING USA, INC.
(f/k/a SORIN GROUP USA, INC.),
        Defendants.

_____/

## COMPLAINT

Plaintiff, SARA ALLENGER, as Personal Representative of the Estate of MARK PRATT,

sues Defendants, LIVANOVA PLC, LIVANOVA DEUTSCHLAND GMBH (f/k/a SORIN

GROUP DEUTSCHLAND GMBH) and LIVANOVA HOLDING USA, INC. (f/k/a SORIN

GROUP USA, INC.), and alleges:

## GENERAL ALLEGATIONS

1.     This is an action for damages in excess of THIRTY THOUSAND and 00/100

($30,000.00) DOLLARS, exclusive of interest and costs.

2.     At all times material hereto MARK PRATT, was sui juris and a resident of Broward

County, Florida. MARK PRATT died on June 12, 2021 as a result of the injuries suffered herein.

3.     Plaintiff, SARA ALLENGER, is the duly appointed Personal Representative of the

Estate of MARK PRATT.

4. At all times material SARA ALLENGER was sui juris, a resident of Broward County, Florida, and was married to Plaintiff, MARK PRATT.

5. At all times material hereto, MEGAN PRATT was the natural born daughter of MARK PRATT and is a statutory survivor.

6. At all times material hereto, JAMIE PRATT was the natural born daughter of MARK PRATT and is a statutory survivor.

7. Defendant LivaNova PLC ("LivaNova") is a foreign for-profit corporation incorporated under the laws of England and Wales with a headquarters in London. LivaNova is a global medical device company specializing in, among other products, devices used in the treatment of cardiovascular diseases. LivaNova pursuant to an October 2015 merger agreement between Sorin Group S.p.A[1] and non-party, Cybertronics, Inc., advised purchasers in the United States it is the responsible party for the Sorin 3T Heater-Cooler System at issue herein. Further, LivaNova has directly communicated with the Food and Drug Administration ("FDA"), 3T System Customers and other interested parties with respect to safety concerns about the 3T System.

8. Defendant, LivaNova Deutschland GmbH (f/k/a Sorin Deutschland GmbH) ("Sorin") is a foreign for profit corporation headquartered in Munich, Germany. Sorin initially designed, manufactured and marketed the Sorin 3T Heater-Cooler System. In October 2015, Sorin merged with and into LivaNova, with LivaNova continuing as the surviving company.

9. Defendant, LivaNova Holding USA, Inc. (f/k/a Sorin Group USA, Inc.) ("Sorin USA") is a U.S. designer, manufacturer, marketer and distributor of the Sorin 3T Heater-Cooler System, with a principal place of business in Arvada, Colorado. Defendant may have relocated to Houston, TX. As set forth in LivaNova's Form 10-Q filed with the Security and Exchange

---

[1] Upon information and belief, Sorin Group S.p.A. was the original holding company of Defendants, Sorin Group Deutschland GMBH and Soring Group USA, Inc.

Commission, Defendants, Sorin and Sorin USA, are wholly owned subsidiaries of LivaNova. Each Defendant markets and sells products under the LivaNova name.

## FACTS COMMON TO ALL COUNTS

10.     On or about December 19, 2018, MARK PRATT, was admitted to Broward Health Medical Center for surgery to replace his bicuspid aortic valve in what is referred to as an open surgical procedure.

11.     Prior to and upon entering into the hospital, MARK PRATT was explained the risks and potential benefits of the aortic valve replacement procedure. The benefits were explained to be the significant improvement of his heart function including an increase in his ejection fraction and what was explained to be resumption of a normal lifestyle after a few months of rehabilitation.

12.     At all times material, Plaintiff's wife, SARA ALLENGER, accompanied him to and participated in the discussions and plans for his surgery.

13.     LivaNova is a global medical device company specializing in, among other products, devices used in the treatment of cardiovascular diseases. LivaNova has directly communicated with the Food and Drug Administration ("FDA"), 3T System Customers and other interested parties with respect to safety concerns about the 3T System.

14.     The bacterium at issue, *Mycobacterium Chimaera,* is a subspecies of nontuberculous mycobacterium ("NTM") that occurs naturally in the environment and rarely causes illness. However, NTM poses a unique risk to patients whose organs and chest cavities are directly exposed to the bacteria during surgery.

15.     Because NTM is a slow growing bacterium, it generally takes anywhere from two (2) weeks to five (5) years before manifestation of an NTM infection, which most commonly results in pulmonary, renal insufficiency and/or cardiovascular disease.

16.     Symptoms of NTM infection are non-specific and may include any of the following: fever, pain, heat or pus around a surgical incision, night sweats, joint and muscle pain, weight loss and fatigue. The diagnosis of an NTM infection requires targeted culturing and/or molecular diagnostic testing.

17.     While an NTM infection diagnosed early on may be successfully treated with a series of antibiotics, there is a significant risk of death in cases diagnosed late and in individuals with considerably weakened immune systems.

18.     The Stockert 3T Systems used at Broward Health were designed, manufactured, marketed and/or sold by LivaNova, Sorin and Sorin USA.

19.     The 3T System regulates blood temperature by circulating water through tubes into a heat exchanger where blood is pumped into separate chambers during surgery. The water tanks and other areas where water pass through aerosolize a vapor containing NTM which exits out of the device and is pushed into the ambient air of the operating room through the device's exhaust fan. If placed in the operating room, the contaminated vapor from the system directly enters the sterile surgical field and the patient's open body.

20.     The potential for contaminated water from heater/cooler devices to infect patients intra operatively was recognized by the medical and scientific community as early as November 2002.[2]

21.     Invasive cardiovascular infections identified as NTM have been reported in Switzerland, Germany and the Netherlands since 2011.[3]

---

[2]See The Heater-Cooler Unit-A Conceivable Source of Infection, Weitkemper, et al., The Journal of the American Society of Extra-Corporeal Technology, 2002
[3] ECDC Rapid Risk Assessment, Invasive Cardiovascular Infection by Mycobacterium Chimaera Potentially Associated with Heater-Cooler Units Used During Cardiac Surgery, April 30, 2015, available online at http://ecdc.europa.eu/en/publications/Publications/mycobacterium-chimaera- infection-associated-with-heater-cooler-units-rapid-risk-assessment-30-April-2015.pdf (last accessed on September 13, 2016).

22.     A public health investigation in Switzerland following six patient infections since 2011, included microbiological examinations of environmental samples that identified *Mycobacterium Chimaera* contamination in heater/cooler units, including water samples from inside the units. Samples of the ambient air were positive for *Mycobacterium Chimaera* when the units were running, but negative when they were turned off.

23.     In April 2011, the FDA visited the device maker Sorin Group Deutschland GmbH in Munchen, Germany, for a plant inspection and to discuss safety concerns with several products, including the 3T System approved in 2005 through the 510(k) process. The FDA advised the company that its 3T Systems harbored dangerous bacteria and that it had failed to make a proper risk assessment for cleaning the devices to avoid bacterial infections in patients exposed in the operating room.

24.     During this inspection, the FDA advised the company that the bacterial growth charts it used to justify the original instruction for device disinfection every 14 days allowed bacterial overgrowth well in excess of safe standards in just one and a half days. The company admitted to the FDA that its cleaning instructions did not meet these standards and that it had no information to support the cleaning methods it disseminated to U.S. purchasers.

25.     On July 15, 2015, the device maker issued a Class 2 Recall of the 3T System because of "potential colonization of organisms, including *Mycobacterium*, in Sorin Heater Cooler Devices, if proper disinfection and maintenance is not performed per instructions for use."

26.     The recall directed customers to follow the new cleaning and disinfection procedures outlined in a Field Safety Notice issued by LivaNova and/or Sorin on June 15, 2015.

27.     According to this Field Safety Notice, the company's hygiene concept was "enhanced" by introducing the following modifications:

    a.     Use filtered tap water when filling the device;

    b.     to make disinfection easier, switch from three different cleaning procedures (every five days, every two weeks and every three months), to just two (every seven days and every fourteen days);

    c.     the option to use peracetic acid instead of Clorox for disinfection;

    d.     use hydrogen peroxide in low dose for device preservation;

    e.     include all external tubing, bottles and buckets in the disinfection process;

    f.     change to polyethylene tubing that meets national drinking water standards; and

    g.     unused heater/coolers should be disinfected bi-weekly.

28.     A month prior to the recall, in May 2015, LivaNova and/or Sorin informed customers that devices that had not been maintained according to the manufacturers' instructions for use ("IFUs") for a long period of time required a mechanical deep disinfection process to remove bacterial colonization, referred to as "biofilm."

29.     Upon information and belief, the Defendants herein by virtue of this knowledge knew, or should have known, that design and/or manufacturing defects in the 3T System renders it prone to bacterial colonization and transmission, *regardless of the cleaning and disinfection procedures used.*

30.     Manufacturing and User Facility Device Experience ("MAUDE") reports, such as one reported to the FDA on July 7, 2016, evidenced that even mechanical deep disinfection followed by the use of filtered water, new water hoses, and three cycles of the new cleaning procedure failed to eliminate high bacteria counts in the 3T System.

31.     On October 21, 2015, following the NTM outbreak in Pennsylvania, the U.S. Centers for Disease Control and Prevention ("CDC") issued an Interim Practical Guidance communication to raise awareness among health departments, healthcare facilities and providers of the association between NTM infections and the use of heater/cooler devices.

32.     On December 29, 2015, the FDA sent LivaNova a warning letter advising the company that its 3T Systems were subject to refusal of admission into the U.S. until it resolved several FDA violations, including the FDA's determination that the 3T Systems were adulterated[4] and misbranded and lacked requisite safety validation for several design changes to both the device itself as well as a series of revised disinfection instructions. The FDA's findings were based on its inspections of the company's Munchen, Germany and Arvada, Colorado production facilities.

33.     In the letter, the FDA identified various design change orders dating back to December 11, 2012, which had never been documented, validated and/or submitted to the FDA for approval.

34.     The letter also identified several changes to the disinfection instructions, dating back to December 20, 2011, which had never been reported to the FDA and which, like the current disinfection instructions, lacked proper efficacy validation.

35.     In April 2016, a Euro Surveillance study following environmental investigations conducted between July 2014 and June 2015 determined that certain 3T Systems manufactured by LivaNova established a direct link between the *Mycobacterium Chimaera* to which patients were exposed and contracted the bacteria and the 3T model

---

[4] Under the Federal Food, Drug and Cosmetic Act, a medical device is "adulterated" if the methods used in, or the facilities or controls used for their manufacture, packing, storage or installation are not in conformity with current good manufacturing practice requirements of the Quality System regulation.

manufactured by LivaNova and used on Plaintiff during his surgery.

36.     A June 1, 2016, FDA Safety Communication following the Euro Surveillance findings noted that "this paper suggests a direct link between the *M Chimaera* to which European patients were exposed and became infected during open-chest cardiac surgery, and one specific heater/cooler model – the 3T." The FDA cautioned U.S. purchasers of the 3T that if they purchased their units before September 2014, they may have been shipped from the factory contaminated with *Mycobacterium Chimaera.*

37.     In June 2016, a study published in the Journal of Emerging Infectious Diseases confirmed the airborne transmission of NTM via 3T Systems due to the ability of the System's exhaust fan to disrupt the ultraclean air ventilation systems of operating rooms. According to the study, aerosolization from the 3T carried *Mycobacterium Chimaera* particles a distance of up to five (5) meters from the device.

38.     On June 2-3, 2016, the FDA hosted a Circulatory System Devices Panel for the Medical Devices Advisory Committee to address the public health risk posed by heater/cooler devices, and in particular, the 3T System.

39.     During this Panel, the FDA noted that nearly 90% of the Medical Device Reports ("MDR") it received between January 2010 and February 2016 citing device contamination and patient infection were attributed to the 3T System.

40.     During this Panel, a LivaNova representative admitted that the company  was in the process of retrofitting 3T Systems with new design features, including, but not limited to, changing tubing materials from PVC to polyethylene to limit biofilm information and the introduction of plugs in the water circuit to prevent sitting water.

41.     On October 13, 2016, the CDC released the results of genome sequencing studies confirming that patient infections were directly linked to LivaNova's Munich, Germany manufacturing site.

42.     That same day, the FDA issued an updated Safety Communication instructing hospitals throughout the country to discontinue using 3T Systems manufactured before September 14, 2016, due to evidence of "point source contamination at the production site."

43.     On November 1, 2016, the FDA issued its recommendation that prohibited the use of the device at issue until such time as it could be made safe. The FDA strongly encouraged that the use of 3T devices manufactured prior to September 2014 should be limited to emergent and/or life threatening situations if no other heater/cooler devices were available. The FDA also went on to recommend vigilance in cleaning and disinfecting device and to vent the heater/cooler device away from the sterile operating field.

44.     In October 2018, LivaNova issued new guidance providing new intructions to monitor the concentration of hydrogen peroxide in the devices and informed of a design upgrade that would reduce the risk of emissions that would be aerosolized into the surgery suite. These instructions failed to cure the infection problem.

45.     On November 1, 2018, the FDA issued a Class 2 recall of the device and issued its guidance to the Defendants that:

> "LivaNova has become aware that **due to a chemical reaction, the disinfectant/water preservative used to disinfect the device to inhibit/limit the growth     of     micro-organisms, may be rendered ineffective**. In addition, LivaNova is releasing a design upgrade to reduce the risk of potential emission of aerosols from the 3T."

The Defendants failed to correct the design flaws in the device used on MARK PRATT.

46.     By May 21, 2019, the CDC advised hospitals to alert patients like MARK PRATT of the risk of the potential for contamination and infection. No such warning was made.

47.     On or about December 19, 2018, MARK PRATT underwent surgery to have a replacement valve inserted for his aortic bicusoid valve.

48.   On or about May 23, 2020,  MARK PRATT was definitively diagnosed as having contracted *Mycobacterium Chimaera* infection from the Sorin Stockert 3T device manufactured by Defendants herein and operated by Broward Health duringhis surgery at their facility. .

## COUNTI
### Negligence - Design Defect

49.     Plaintiff incorporates by reference paragraphs 1 - 4 8  as if fully set forth herein.

50.     The 3T System is a product within the meaning of Florida products liability law.

51.     The 3T System was expected to reach, and did reach, users and/or consumers, including MARK PRATT, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

52.     Under Florida products liability law, Defendants, LivaNova, Sorin and Sorin USA, owed MARK PRATT, a duty to exercise reasonable care in designing and testing the 3T System.

53.     Defendants, LivaNova, Sorin and Sorin U.S.A. designed the 3T System for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

54.     At all times material, the 3T System was used in a manner intended and/or foreseeable to the Defendants.

55.     A patient or consumer using the 3T System would reasonably expect the device to be free of significant defects.

56.     The 3T System, as designed by the Defendants, colonizes bacteria, including *Mycobacterium Chimaera*.

57.     The 3T System, as designed by the Defendants, directly transmits bacteria, including *Mycobacterium Chimaera,* to patients during invasive surgery.

58.     The foreseeable risks of using the 3T System, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T System.

59.     Reasonable alternative designs existed for the 3T System which would have eliminated or reduced the risk of bacterial colonization and/or transmission of such bacteria to patients undergoing invasive surgical procedures.

60.     Reasonable and feasible alternative designs include, but are not limited to, measures to direct airflow away from the surgical field (i.e. a housing unit for the exhaust vent), reducing the force at which air is vented from the System to a rate of less than 1000 cubic feet per minute, water reservoir isolation by using closed loop fluid management, an open water design to prevent inaccessible airspace, removable lids and parts for  easy  disinfection, disposable tank liners to prevent biofilm  formation,  and internal  pasteurization or UV features to kill bacteria.

61.     The failure to use feasible, reasonable alternative designs that eliminate bacterial colonization  and the aerosolization of bacteria into the ambient air of operating rooms renders the 3T System unreasonably unsafe.

62.     Defendants knew or should have known as early as 2002 that NTM, or other harmful bacteria, could colonize within the 3T System and be spread to patients during surgery

through the exhaust vent.

63.     MARK PRATT's *Mycobacterium Chimaera* infection was caused by Defendants.   According to this Field Safety Notice, the company's hygiene concept was "enhanced" by introducing the following modifications:

    a.  Failing to conduct adequate safety and efficacy testing before placing the 3T System into the stream of commerce;

    b.  Failing to timely establish procedures for reviewing the design of the 3T System after receiving information that patients were developing bacterial infections as a result of surgeries using the System;

    c.  Failing to timely establish procedures for validation or, where appropriate, review and approval of design change orders for the 3T System before their implementation as required under 21 CFR 820.30(i); and

    d.  Failing to design or redesign the 3T System to eliminate or mitigate bacterial colonization and/or transmission of such bacteria.

64.   MARK PRATT, was proximately harmed by the aforesaid design defects in the 3T System as described above.

65.   As a direct and proximate result of the negligence of the Defendants, MARK PRATT underwent surgery that utilized a Sorin Stockert 3T device that was infected with *Mycobacterium Chimaera* and contracted *Mycobacterium Chimaera* infection which was the proximate cause of his death. As a direct and proximate result of the negligence of the Defendants, the Defendants are liable to the Plaintiff for all damages to which the estate and/or the survivors are entitled, including but not limited to, the following:

    a.   Loss of support and services to each survivor from the date of the death;

b.     Loss of companionship and protection;

c.     Mental pain and suffering;

d.     Funeral expenses due to the estate; and

e.     Loss of prospective net accumulations of the estate.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Florida, together with interest thereon, costs of suit and attorneys' fees.

## COUNT II
### Strict Liability-Manufacturing
### Defect

66.  Plaintiff incorporates by reference paragraphs 1 - 4 8  as if fully set forth herein.

67.   The 3T System is a product within the meaning of Florida products liability law.

68.  The 3T System was expected to reach, and did reach, users and/or consumers, including MARK PRATT, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

69.   Defendants, LivaNova, Sorin and Sorin U.S.A. manufactured the 3T System for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

70.   At all times material, the 3T System was used in a manner intended and/or foreseeable to the Defendants.

71.   A reasonable patient or consumer of the 3T System would expect that the

device be free of significant defects.

72.   The 3T System, as manufactured by the Defendants, colonizes bacteria, including *My c o b a c t e r i u m   C h i m a e r a*.

73.   The 3T System, as manufactured by the Defendants, directly transmits bacteria, including *My c o b a c t e r i u m   C h i m a e r a,* to patients during invasive surgery.

74.   The foreseeable risks of using the 3T System, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T System.

75.   MARK PRATT'S *Mycobacterium Chimaera* infection was caused by the following manufacturing defects:

   a.   Failing to timely establish procedures or practices to prevent the 3T System from being contaminated with NTM on the production line or elsewhere at Defendants' production facilities;

   b.   Manufacturing and selling the 3T System with NTM contamination that occurred on the production line or elsewhere at Defendants' production facilities; and

   c.   Failing to ensure proper workmanship, materials and labeling for the 3T System.

76.   MARK PRATT was proximately harmed by the aforesaid manufacturing defects in the 3T System as described above.

77.   As a direct and proximate result of the actions of the Defendants, MARK PRATT underwent surgery that utilized a Sorin Stockert 3T device that was infected with

*Mycobacterium Chimaera* and contracted *Mycobacterium Chimaera* infection which was the proximate cause of his death. As a direct and proximate result of the negligence of the Defendants, the Defendants are liable to the Plaintiff for all damages to which the estate and/or the survivors are entitled, including but not limited to, the following:

    a.   Loss of support and services to each survivor from the date of the death;

    b.   Loss of companionship and protection;

    c.   Mental pain and suffering;

    d.   Funeral expenses due to the estate; and

    e.   Loss of prospective net accumulations of the estate.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Florida, together with interest thereon, costs of suit and attorneys' fees.

## COUNT III
### Negligence- Warnings Defect

78. Plaintiff incorporates by reference paragraphs 1-48 as if fully set forth herein.

79. The 3T System is a product within the meaning of Florida products liability law.

80. The 3T System was expected to reach, and did reach, users and/or consumers, including MARK PRATT, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

81. Defendants, LivaNova, Sorin and Sorin U.S.A, owed MARK PRATT, a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling the 3T System.

82.     Defendants, LivaNova, Sorin and Sorin U.S.A. marketed, advertised and promoted the 3T System for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

83.     At all times material, the 3T System was used in a manner intended and/or foreseeable to the Defendants.

84.     A reasonable patient or consumer of the 3T System would expect that the device be free of significant defects.

85.     The 3T System colonizes bacteria, including *Mycobacterium Chimaera* and directly transmits such bacteria to patients during invasive surgery.

86.     Defendants knew or should have known as early as 2002 that NTM, or other harmful bacteria, could colonize within the 3T System and be spread to patients during surgery through the exhaust vent.

87.     The foreseeable risks of using the 3T System, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T System.

88.     MARK PRATT'S *Mycobacterium Chimera* infection was caused by Defendants' conduct as follows:

    a.  Failing to provide proper cleaning and disinfection procedures for the 3T System;

    b.  Failing to conduct proper validation studies to demonstrate the safety and efficacy of cleaning and disinfection procedures for the 3T System;

    c.  Failing to warn patients like MARK PRATT and/or purchasers of the 3T System that the system colonized bacteria and unnecessarily transmitted

it into the ambient air of operating rooms;

d.  Failing to timely notify known purchasers of the 3T System that patients could be exposed to *Mycobacterium Chimaera;*

e.  Failing to alert hospitals and patients to promptly test for NTM infection when patients present with fever, pain, heat or pus around a surgical incision, night sweats, join and muscle pain, weight loss and fatigue after surgery using the 3T System; and

f.  Failing to timely notify known purchasers of the 3T System to relocate the device from the operating room during surgery to prevent patient transmission of NTM.

89.  MARK PRATT was proximately harmed by the aforesaid warnings defects in the 3T System as described above.

90.  As a direct and proximate result of the negligence of the Defendants, MARK PRATT underwent surgery that utilized a Sorin Stockert 3T device that was infected with *Mycobacterium Chimaera* and contracted *Mycobacterium Chimaera* infection which was the proximate cause of his death. As a direct and proximate result of the negligence of the Defendants, the Defendants are liable to the Plaintiff for all damages to which the estate and/or the survivors are entitled, including but not limited to, the following:

a.  Loss of support and services to each survivor from the date of the death;

b.  Loss of companionship and protection;

c.  Mental pain and suffering;

d.  Funeral expenses due to the estate; and

e.  Loss of prospective net accumulations of the estate.

WHEREFORE, Plaintiff demands judgment against Defendants, individually,

jointly, vicariously, severally,  exclusive of costs and interest, and further demands trial by

jury.

> VALENTE LAW FIRM
> Attorneys for Plaintiffs
> 1818 South Australian Avenue
> Suite 302
> West Palm Beach, FL 33409
> (561) 615-6200
> (561) 615-6206 -FAX
> EMAIL: phil@valentepa.com
>            leila@valentepa.com

By:  ___/s/ PHILIP L. VALENTE, JR.___
       Philip L. Valente, Jr., Esquire
       Florida Bar No.: 822124